# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JULIE GINGRAS,

                          Plaintiff,          Case No. 13-CV-1368-JPS

v.

MILWAUKEE COUNTY,

                          Defendant.                    ORDER

In this civil suit, filed on December 4, 2013, Plaintiff, Julie Gingras, alleges discrimination on the basis of her "sex and family/caregiving responsibilities" against Defendant, Milwaukee County, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (Docket #1 at 12). This matter comes before the Count on the defendant's Motion for Summary Judgment, filed on March 16, 2015. (Docket #23). The motion is now fully briefed and ready for disposition.[1] As discussed in detail below, the Court finds as a matter of law that the defendant is entitled to summary judgment.

Before turning to the undisputed facts, however, the Court must address one preliminary matter. On April 13, 2015, the plaintiff filed a Motion to Set Aside or For Leave to Withdraw Admissions. (Docket #35). The motion was in response, the Court presumes, to a footnote in the defendant's summary judgment brief which states the following:

---

[1]This case was initially before Magistrate Judge William E. Callahan. On March 19, 2015, and during the briefing of the summary judgment motion, the case was randomly reassigned to Magistrate Judge William E. Duffin. On March 30, 2015, the plaintiff filed its refusal to jurisdiction by a United States magistrate judge, and thus, the case was randomly reassigned to this branch of the court. (*See* Docket #29).

Defendant relies on the record developed to support its summary judgment motion. However, Defendant would note that Plaintiff failed to timely respond to Defendant's First Set of Discovery Requests, including the Requests for Admission, and thus they are deemed admitted under FRCP 36(a)(3). See Affidavit of Ron Stadler, ¶¶ 2-3, Exs. A-B. Further, Plaintiff has never moved this Court to be relieved from the requests being deemed admitted as required pursuant to FRCP 36(b). While the evidence in the record is more than sufficient to grant summary judgment in Defendant's favor – with or without the deemed admitted facts—Defendant objects to any attempt by Plaintiff to argue facts inconsistent with the requests for admission which were deemed admitted.

(Def's Mot. S. J., Docket #24 at 2). The plaintiff acknowledges that the admissions were deemed admitted as a result of its failure to timely respond, and asks that the Court permit the admissions be withdrawn. (*See* Docket #35).

In order to be relieved from matters deemed admitted due to an untimely response, the movant, here the plaintiff, must convince the Court that allowing withdrawal would promote the presentation of the merits of the case and that the nonmoving party would not suffer prejudice if the withdrawal is permitted. Fed. R. Civ. P. 36(b). Here, the parties agree, as they must, that allowing the withdrawal would promote the presentation of the merits, but disagree on the question of prejudice. The Court need not dwell on this issue, however, because it grants summary judgment in favor of the defendant even with the withdrawal of the plaintiff's admissions. As such, and in accordance with the Seventh Circuit's well-established policy favoring the resolution of cases on the merits, *see Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 811 (7th Cir. 2007); *Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004), the Court will grant the plaintiff's

Motion to Set Aside or For Leave to Withdraw Admissions. (Docket #35). The Court now turns to address the defendant's Motion for Summary Judgment.

1.    FACTUAL BACKGROUND[2]

1.1    The Parties

The defendant, Milwaukee County, operates a mental health facility known as the Behavioral Health Division ("BHD"). (Defendant's Proposed Finding of Fact ("DPFF") ¶ 1). Within the BHD there is an Educational Services Department which trains and educates new and current staff. (DPFF ¶ 2). In May 2012, Mary Kay Bultman ("Ms. Bultman") was hired as the Director of Educational Services.  (DPFF ¶ 3).

The plaintiff is female and, at the time relevant to this action, maintained primary care responsibilities and duties for her five children. (Plaintiff's Proposed Findings of Fact ("PPFF") ¶ 1).[3] The plaintiff has a Master's degree in Business Administration and a Master's of Science in Nursing. (DPFF ¶ 9). The plaintiff has experience working for various health care providers, some of which are in the education context. (DPFF ¶ 10).

---

[2]The cited facts are from the parties' proposed findings of fact, unless otherwise indicated. (Docket #25, #31).

[3]The Court notes the defendant's objections to the Plaintiff's Proposed Finding of Fact. (Docket #40). The defendant did not respond individually to any of the plaintiff's facts as a result of general objections related to: (1) the PPFF contradict matters conclusively established through default admissions; and (2) the form and content of the PPFF. (Docket #40 at 1-2). Under most circumstances, the Court would require more briefing on this issue to better develop the factual record. However, because the Court finds that the defendant is entitled to summary judgment as a matter of law, while assuming all facts in favor of the plaintiff, further briefing is simply unnecessary.

Case 2:13-cv-01368-JPS   Filed 08/31/15   Page 3 of 26   Document 43

### 1.2 The Defendant Hires the Plaintiff

In May 2013, the plaintiff received a call from a nurse recruiter regarding a position in the Milwaukee County BHD. (DPFF ¶ 13). The position was for an Education Coordinator who would train and educate current and new staff at the BHD. (DPFF ¶ 14). The plaintiff participated in a phone interview and an in-person interview with the nurse recruiter during May 2013. (DPFF ¶ 15). In June 2013, the plaintiff interviewed in-person with Ms. Bultman, Cheryl Schloegl (Assistant Director of Nursing—female), Laurie Hess (Emergency Department Manager—female), and Katie Stecker (Nursing Administration—female). (DPFF ¶ 16).

During the interview and hiring process, the plaintiff discussed her child care obligations with the defendant and how those obligations would affect her work schedule. (PPPF ¶ 6). The plaintiff acknowledges that prior to the time the defendant hired her, Ms. Bultman knew that the plaintiff was female and that she had young children. (Pl's Resp. to DPFF ¶ 18).

In approximately June 2013, and after the in-person interview, the defendant offered the plaintiff a position as an Educational Services Coordinator in the Educational Services Department of its BHD. Ms. Bultman was the individual who recommended that the plaintiff be hired for the position. (DPFF ¶ 17).

### 1.3 Pre-Employment Interaction

On or about July 3, 2013, Ms. Bultman spoke with the plaintiff via telephone. (PPFF ¶ 11). During that conversation, Ms. Bultman told the plaintiff that her start date would be July 8, 2013. The plaintiff told Ms. Bultman that she likely would not be able to find any child care for all of her children on such short notice and that she could not begin her employment with the defendant on July 8, 2013. (PPFF ¶ 12). As a result, Ms. Bultman told

Case 2:13-cv-01368-JPS   Filed 08/31/15   Page 4 of 26   Document 43

the plaintiff that her start date at the defendant could instead be July 15, 2013. (PPFF ¶ 13). During the same conversation, the plaintiff told Ms. Bultman that she would begin the process of securing child care after she received a written offer of employment from the defendant. Ms. Bultman said that she would speak to the defendant's Human Resources Department and that a written offer of employment would be forthcoming. (PPFF ¶ 14).

On July 11, 2013, the plaintiff told an individual in the defendant's Human Resources Department that she could not start work on Monday, July 8, 2013, with the rest of the new hires and that she needed a written offer of employment before she would secure childcare for her children. Approximately forty minutes after this phone call, Valerie Sprewell, Human Resources Coordinator, sent a written confirmation of employment to the plaintiff. (PPFF ¶¶ 16-17). The offer specified, among other things, that the plaintiff's start date was July 15, 2013, that her work hours were "the AM SHIFT (8:00 a.m. - 4:30 p.m.)," and that if she had questions about her hours, she needed to address those with her supervisor. (PPFF ¶ 17). The plaintiff maintains that at no time prior to receiving the written confirmation of employment from the defendant, dated July 11, 2013, did Ms. Bultman or anyone at the defendant inform her that her days and hours of work would be the "AM SHIFT (8:00 a.m. - 4:30 p.m.)." (PPFF ¶ 18). Ms. Bultman was copied on and received a copy of the plaintiff's written confirmation of employment, but Ms. Bultman did not draft the confirmation of employment and did not have any input into it. (PPFF ¶ 20). Kendra Rodriguez, HR/Management Assistant, was also copied on the plaintiff's written confirmation of employment. (PPFF ¶ 20).

On or about July 13, 2013, Ms. Rodriguez called the plaintiff via telephone. The plaintiff told Ms. Rodriguez that her written confirmation of

employment reflected work hours that were different than what she discussed previously with Ms. Bultman. Specifically, the plaintiff noted that the defendant had encouraged flexibility regarding her work schedule and work hours. Ms. Rodriguez told the plaintiff that she could discuss this with Ms. Bultman. (PPFF ¶ 22).

### 1.4    The Plaintiff's Employment at Defendant

On or about July 15, 2013, the plaintiff began her employment with the defendant as an Educational Services Coordinator—Registered Nurse II working in the Educational Services Department of the defendant's BHD. The plaintiff began her employment by attending orientation sessions from July 15, 2013, to July 19, 2013, and from July 22, 2013, to July 26, 2013. (PPFF ¶ 24). As of July 15, 2013, the defendant's Educational Services Department consisted of the following individuals: Mary Bryar (Educational Services Coordinator—Registered Nurse), Donna Jensen (Educational Services Coordinator—Registered Nurse), the plaintiff, and Keith Hice (Systems Analyst). (PPFF ¶ 27).

The plaintiff, like most other new employees of the defendant, was subject to a probationary period. (DPFF ¶ 25). Pursuant to the Employee Handbook, each employee's first 1,040 hours (approximately six months of full time employment) is their probationary period. The policy states:

> Probationary Period
> For most positions at Milwaukee County, the first 1,040 hours of employment is considered to be your Probationary Period. During this time, you should work with your supervisor to determine whether or not the position is a good match, and to ensure you have received adequate training. Should your work performance not meet expectations during your Probationary Period, your manager may either recommend to Human Resources an extension to your Probationary Period, or may

terminate your employment without providing formal discipline.

(DPFF ¶ 26). The plaintiff testified that "…there was a real emphasis on don't call in, don't have any attendance issues during your probationary period. But once that occurred or happened, they had to follow the attendance policy after that." (PPFF ¶ 50).

Other newly hired employees in the defendant's BHD began their employment on July 8, 2013, by attending orientation sessions. (PPFF ¶ 30). Ms. Bultman was scheduled to instruct and speak at the plaintiff's orientation sessions, but she "flexed in and flexed out depending on [her] meeting schedule." (PPFF ¶ 31).

### 1.5 Alleged Discriminatory Conduct and Comments

At the outset, the Court notes that the parties dispute many of the facts related to interactions between the plaintiff and Ms. Bultman—none of which are material to deciding the ultimate issue of sex discrimination. However, in order to provide a proper background, the Court will briefly summarize these interactions. On July 15, 2013, when the plaintiff arrived to work for her first day, Ms. Bultman spoke to the plaintiff briefly about the defendant's need and desire to change its culture, particularly in its BHD. (PPFF ¶ 33). The outcome of this conversation was that there was an expectation that the plaintiff help change the defendant's culture by shaping and influencing new employees' attitudes and thoughts about the defendant because it was "very negative there." (PPFF ¶ 33).

The plaintiff maintains she did not engage in argumentative or confrontational conversations or interactions with the defendant's staff or other newly hired employees, despite, in her opinion, the disorganized nature of the sessions. (PPFF ¶ 34). During the orientation sessions from

July 15, 2013, to July 19, 2013, and from July 22, 2013, to July 26, 2013, Ms. Bultman had infrequent interactions with the plaintiff. When Ms. Bultman did converse with the plaintiff during the orientation sessions from July 15, 2013, to July 19, 2013, and from July 22, 2013, to July 26, 2013, the plaintiff describes the topics of conversation as Ms. Bultman asking about or discussing the plaintiff's child care obligations and responsibilities and/or Ms. Bultman's frustrations with employees who were not regularly at work at the defendant. The plaintiff testified at her deposition: "Almost all of our conversations…revolved around either other employees taking leave or how I was going to have childcare provided." (PPFF ¶ 39). On July 18, 2013, the plaintiff alleges that Ms. Bultman rolled her eyes, made a facial reaction, did not answer her questions, and stated, "Julie, you can just go home," in relation to a work related question. (PPFF ¶ 40).

At some point during the plaintiff's brief employment, she informed Ms. Bultman about needing to attend weekly future appointments for her children, such as physical therapy appointments, speech therapy appointments, appointments at her children's school, and "birth to three" classes for her newborn twin daughters. The plaintiff told Ms. Bultman that the "plan" was to schedule these appointments "for later on in the afternoon" so as to not disrupt her work schedule, but there was no guarantee because "[o]ftentimes these appointments were scheduled a day or two before," and the plaintiff could not control the scheduling of the appointments. (PPFF ¶ 46). Ms. Bultman allegedly made comments and expressed displeasure to the plaintiff, such as, "Why do you need to do that?" "You can't do that after work?" "Can't your husband take them?" and "I understand, but we need you here at work." (PPFF ¶ 46).

During the orientation sessions during the week of July 22, 2013, Ms. Bultman allegedly complained and expressed her displeasure to the plaintiff about employees of the defendant who were not regularly at work at the defendant pursuant to allowable or legally protected leave—such as Family and Medical Leave Act ("FMLA") leave, or leave pursuant to a Collective Bargaining Agreement. (PPFF ¶ 48). For example, Ms. Bultman commented that she had to cover shifts when other employees were not at work and that employees were "taking advantage" of the system. (PPFF ¶¶ 48-49).

The parties also dispute the facts related to an incident that occurred on July 29, 2013; for the purposes of summary judgment, the Court will summarize the plaintiff's version. The plaintiff testified that on or about July 25, 2013, she told Ms. Bultman that she needed to take three of her children to dentist appointments on Monday, July 29, 2013. (PPFF ¶ 52). Ms. Bultman replied, "Okay," and gave no indication that the plaintiff needed to be at work on July 29, 2013. (PPFF ¶ 52). Ms. Bultman further stated that the plaintiff did not need to work a second shift to make up the missed time. (PPFF ¶ 52).

On July 26, 2013, Ms. Bultman sent the plaintiff an email with the subject line, "Welcome Paragraph," stating:

> Here is my 'Welcome' for you.
>
> Please join me in welcoming Julie Gingras, RN, MSN, MBA to the Behavioral Health Division of Milwaukee County. Julie will be joining the Educational Services Department as an Ed Services Coordinator. Julie comes to us with teaching experience as well as a strong background in Quality Improvement and Accreditation. Julie is a wonderful addition to our department.

(PPFF ¶ 55). On Sunday, July 28, 2013, at 10:43 p.m., the plaintiff responded to this email and reminded Ms. Bultman of her childcare responsibilities on

Monday, July 29, 2013. (PPFF ¶ 58). The email read: "I just wanted to remind you of my children's dental appointment Monday morning and that I won't be in." (DPFF ¶ 41).

Ms. Bultman alleges this email communication was the first indication she received that the plaintiff needed off work. (DPFF ¶ 40). Further, Ms. Bultman testified that she understood the email to be indicating that the plaintiff would be absent in the morning on Monday, not gone the entire day. (DPFF ¶ 41). On July 29, 2013, the plaintiff was not at work at the defendant because of her pre-arranged family care responsibilities. (PPFF ¶ 60).

### 1.6 Defendant Terminates the Plaintiff

On July 30, 2013, the defendant terminated the plaintiff's employment during a meeting between Ms. Bultman, the plaintiff, and Ms. Sprewell. (PPFF ¶ 62). The plaintiff's description of the events the day of her termination are as follows: At 7:47 a.m., Ms. Bultman sent the plaintiff an email stating, in relevant part, "Julie, [t]here must have been some confusion on your part about yesterday. It was my understanding that you needed to be off for a couple of hours yesterday and not the entire day. You are still in orientation and on probation…." (PPFF ¶ 64). After receiving the email, the plaintiff saw Ms. Bultman in person and asked if there was an issue about her missing work the day before. Ms. Bultman responded, "Our workday is 8:00 a.m. to 4:30 p.m., Monday through Friday." (PPFF ¶ 65).

Approximately ten minutes later, Ms. Bultman told the plaintiff that she (Bultman) had to go to a meeting at 9:00 a.m., but that she wanted the plaintiff to attend a committee meeting with her at 10:00 a.m. (PPFF ¶ 66). At approximately 10:00 a.m., Ms. Bultman and the plaintiff went to Ms. Sprewell's office where Ms. Bultman said, "This isn't a committee meeting, Julie, it's a meeting about you." (PPFF ¶ 67). After entering a conference

room, Ms. Bultman told the plaintiff that the defendant was terminating her employment because she was not "a good fit." (PPFF ¶ 68). The plaintiff maintains that Ms. Bultman and Ms. Sprewell refused to elaborate as to why she was not a "good fit." (PPFF ¶ 68).[4] At some point after this incident, Ms. Bultman hired Lottie Stenjem, a female, to replace the plaintiff. (DPPF ¶ 61).

2.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or

---

[4] In a written discovery response, Ms. Bultman responded that the plaintiff was terminated "due to her general poor attitude, belligerent manner and lack of a cooperative approach to others" and "because it had become obvious that she was not a good fit for the position." (PPFF ¶ 69).

declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

3.      DISCUSSION

The defendant's Motion for Summary Judgment argues that the plaintiff cannot maintain a sex discrimination claim under Title VII because no facts exist to support the assertion that gender played any part in her termination. (Docket #24 at 1). The plaintiff opposes the motion and argues that factual disputes exist and credibility issues remain such that a rational jury could conclude that the defendant terminated the plaintiff on the basis of her sex. (Docket #30 at 1).  As discussed below, the Court finds that no facts support a sex discrimination claim under Title VII and, accordingly, that the defendant is entitled to summary judgment as a matter of law.

3.1      Legal Standard–Title VII Sex Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discharge or otherwise discriminate against an employee because of that person's sex. *See* 42 U.S.C. § 2000e–2(a)(1). A plaintiff bringing a Title VII discrimination claim can defeat a motion for summary judgment by using either the direct or indirect method of proof. *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1068 (7th Cir. 2012).

The plaintiff proceeds under the direct method of proof, which requires sufficient direct or circumstantial evidence of a discriminatory

motive behind her employer's action.[5] *See Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). Direct evidence is akin to an explicit admission that an employment decision was motivated by discrimination. *See Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Direct evidence of discriminatory intent is rare, *id.*, and the plaintiff does not claim to have any here. (Pl's Opps. at 6 n.11, Docket #30) ("Ms. Gingras does not have direct evidence of discrimination under the direct method of proof."). Instead, Plaintiff offers circumstantial evidence to "prove that the defendant terminated her employment because of her sex." (Pl's Opp. at 6, Docket #30). To survive summary judgment, this evidence must create "a convincing mosaic…that would allow a jury to infer intentional discrimination by the decisionmaker." *Silverman v. Bd. of Educ. of the City of Chi.*, 637 F.3d 729, 734 (7th Cir. 2011).

Circumstantial evidence of discrimination may include: (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Darchak v. City of Chi. Bd. of Ed.*, 580 F.3d 622, 630 (7th Cir. 2009); *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720–21 (7th Cir. 2005).

Each type of circumstantial evidence is sufficient in and of itself to support a judgment for the plaintiff; however, bits of circumstantial evidence may also be used to compose a convincing mosaic of discrimination. *See*

---

[5]Although initially unclear from the defendant's Motion for Summary Judgment, the plaintiff clearly states in her Opposition that she does not proceed under the indirect method of proof via the burden-shifting method in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). (Pl's Opp. at 6 n.8, Docket #30). As such, the Court will limit its analysis to the direct method.

*Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). To be convincing, a plaintiff's collection of circumstantial evidence must "directly point to a discriminatory reason for the employer's action and also be directly related to the employment decision." *Whitfield v. Int'l Truck & Engine Corp.*, 755 F.3d 438, 443 (7th Cir. 2014).

The parties go to great length arguing over whether the Court should consider the plaintiff's "sex plus" claim that she was discriminated on the basis of gender plus her family care responsibilities. As the parties note, the Seventh Circuit has not decided "whether [it] recognize[s] a 'sex-plus' theory of discrimination [citation], which hinges on disparate treatment based on sex in conjunction with another characteristic." *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). However, this question ultimately need not be answered because, as the Second Circuit has noted, "[t]he term 'sex plus' or 'gender plus' is simply a heuristic…developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against."

Title VII does not prohibit discrimination on the basis of family responsibilities alone, but rather on the basis of family responsibilities *plus* gender. *See Phillips v. Martin Marietta Corp.*, 400 U.S. 542, 544 (1971) (distinct hiring policies for woman and men, each having pre-school-age children, may violate Title VII); *Sprogis v. United Air Lines,* 444 F.2d 1194, 1198 (7th Cir. 1971) (finding a no-marriage rule directed against only female flight attendants is sex discrimination in violation of Title VII.); *Stern v. Cintas Corp.,* 319 F.Supp.2d 841, 858 (N.D. Ill. 2004) ("Under Title VII, an employer may not treat mothers and mothers-to-be differently from fathers and fathers-to-be."). "Gender plus" claims are really a sub-category of gender

Case 2:13-cv-01368-JPS   Filed 08/31/15   Page 14 of 26   Document 43

discrimination claims, and a plaintiff must allege discrimination, harassment or retaliation based on her gender plus her familial status, not merely familial status alone. *See Stern,* 319 F. Supp. 2d at 858. Thus, regardless of how the parties phrase the argument, the plaintiff's mosaic circumstantial evidence of discrimination must allow a rational jury to infer that she was fired "at least in part because she was female." *See Coffman,* 578 F.3d at 564.

### 3.2    Analysis

With this standard in mind, the Court will examine the plaintiff's mosaic circumstantial evidence to determine whether it "would allow a jury to infer intentional discrimination by the decisionmaker." *See Silverman,* 637 F.3d at 734.  To avoid any confusion, however, the Court finds it necessary to begin its discussion with an explanation of what this case is not about—illegal gender stereotyping—a classification made necessary by the plaintiff's, at times, confusing arguments. The Court then turns to discuss the plaintiff's three types of evidence presented to infer intentional sex discrimination.

As discussed in detail below, the Court finds that the plaintiff fails to meet her burden. While the evidence may allow a jury to infer that the plaintiff was terminated in part because of her family responsibilities, there is simply nothing in the record that suggests that she was fired because she was female—and, as described below, this is not a distinction without a difference.

### 3.2.1   Illegal Gender Stereotyping

As the defendant notes in it's reply brief, at some point the plaintiff's argument confusingly "mutates" from a gender-plus claim into a claim of illegal stereotyping. (*See* Def's Reply at 6, Docket #6). As such, the Court finds it important to discuss this issue more thoroughly.

The Supreme Court identified sex-based stereotyping as an impermissible form of discrimination in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989). There, an employer denied a woman partnership at the accounting firm for which she worked and was told that she was too aggressive and macho, should attend a charm school, and should dress and behave more femininely. *Id.* The Supreme Court held that such remarks were evidence of sex-based stereotyping, which in turn suggested that sex discrimination was the cause of the failure to promote. *Id.* at 251. The Court pointedly said, "[w]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group." *Id.*

The Supreme Court and several circuits have had occasion to confirm that the assumption that a woman will perform her job less well due to her presumed family obligations is a form of sex-stereotyping and that adverse job actions on that basis constitute sex discrimination. *See Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 730 (2003); *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 120 (2d Cir. 2004) (identifying sex-stereotyping where employer stated that a woman could not "be a good mother" and work long hours, and that a woman "would not show the same level of commitment… because [she] had little ones at home"); *Lust v. Sealy, Inc.*, 383 F.3d 580, 583 (7th Cir. 2004) (sex-stereotyping found where decisionmaker admitted he did not promote plaintiff "because she had children and he didn't think she'd want to relocate her family, though she hadn't told him that"); *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 57 (1st Cir. 2000) (finding proof of sex-based discriminatory animus where direct supervisor questioned "whether [the plaintiff] would be able to manage her work and family responsibilities"); *Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1045 (7th Cir.

1999) (finding direct evidence of discrimination where supervisor told employee "that she was being fired so that she could 'spend more time at home with her children'" because statement "invoked widely understood stereotypes the meaning of which is hard to mistake").

These cases stand for the proposition that "unlawful sex discrimination occurs when an employer takes an adverse job action on the assumption that a woman, because she is a woman, will neglect her job responsibilities in favor of her presumed childcare responsibilities." *Chadwick v. WellPoint, Inc.,* 561 F.3d 38, 44-45 (1st Cir. 2009). The "essence" of Title VII here is that women have "the right to prove their mettle in the work arena without the burden of stereotypes regarding whether they can fulfill their responsibilities." *Id* at 45.

Here, the Court finds no facts to support a theory of discriminatory stereotyping that led to the plaintiff's discharge. The undisputed facts show that the defendant hired the plaintiff will full knowledge that she was a woman with five young children at home. (Bultman Affd. ¶ 11). The record does not reflect that any illegal stereotyping led the defendant to believe the plaintiff caring for her children would interfere with her ability to work during scheduled hours. On the contrary, the plaintiff's *own actions and statements* spoke for themselves. The plaintiff notified Ms. Bultman that she was unable to attend the first week of orientation because of child care issues. (PPFF ¶ 12). Even more telling, the plaintiff told Ms. Bultman, shortly after being hired, that she would likely need to miss work in the future because of her children. The plaintiff told Ms. Bultman that the "plan" was to schedule these appointments "for later on in the afternoon" so as to not disrupt her work schedule, but there was no guarantee because "[o]ftentimes these

appointments were scheduled a day or two before," and the plaintiff could not control the scheduling of the appointments. (PPFF ¶ 46).

The defendant's belief that the plaintiff would miss work as a result of her family responsibilities, thus, was based in reality and not in an illegal stereotype based on gender. This distinction—between illegal stereotyping and actual adverse effects on performance—is key here. Indeed, as the First Circuit has articulated,

> [i]t is undoubtedly true that if the work performance of a woman (or a man, for that matter) *actually* suffers due to childcare responsibilities (or due to any other personal obligation or interest), an employer is free to respond accordingly, at least without incurring liability under Title VII. However, an employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family responsibilities.

*Chadwick,* 561 F.3d at 44-45 (emphasis added). Title VII is not a "get out of work free" card for parents with young children–whether male or female. Certainly, if the defendant terminated the plaintiff based on actual performance concerns, and nothing more, there would be no gender discrimination claim. The plaintiff's own actions and statements in this case negate any question as to whether illegal stereotyping occurred.

To be clear, the question presented here does not ask whether the defendant's behavior towards the plaintiff was kind, a good business practice, or anything of the like. Certainly, there is an argument to be made as to whether or not an employer *should* be more accommodating to employee's schedules; this, of course, is a question for the legislature or for individual employers themselves. The *only* question before the Court, under the plaintiff's Title VII claim, is whether the plaintiff provides convincing circumstantial evidence that would "allow a jury to infer intentional sex

discrimination by the decisionmaker." *See Silverman,* 637 F.3d at 734. As discussed in detail below, the answer to this question is undeniably, no, and thus, the defendant is entitled to summary judgment as a matter of law.

### 3.2.2   Circumstantial "Bits and Pieces" Evidence

The first type of circumstantial evidence to show direct discrimination includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe,* 20 F.3d at 736. Under this prong, the plaintiff points to a variety of evidence that allegedly suggests sex discrimination.

First, the plaintiff argues that Ms. Bultman's comments about her child care obligations during her employment reflected unlawful sex discrimination. (Pl's Opp. at 8, Docket #30). The plaintiff alleges that during orientation sessions form July 15, 2013, to July 22, 2013 (which comprised almost the entirety of the plaintiff's employment at defendant), the topic of conversation was "almost always Bultman asking about or discussing Ms. Gingras' child care obligations and responsibilities and/or Bultman's frustrations with employees who were not regularly at work at defendant." (Pl's Opp. at 9). Additionally, the plaintiff alleges that Ms. Bultman made various comments regarding her dissatisfaction with other employees on Family Medical Leave Act ("FMLA") leave or leave pursuant to a Collective Bargaining Agreement. (PPFF ¶¶ 48-49).

As discussed above, the plaintiff's own statements indicated that her work schedule may be affected as a result of her childcare duties. (*See* PPFF ¶ 46). Additionally, the plaintiff missed the first week of orientation admittedly as a result of childcare duties. (PPFF ¶ 12). In light of the plaintiff's explicit comments related to her family care obligations, it is

unclear how a jury would find that Ms. Bultman's inquiries had anything to do with sex discrimination. Additionally, in relation to the FMLA comments, it is also unclear what connection, if any, they have with sex discrimination. As a new employee, the plaintiff was not eligible and not taking FMLA leave. Further, there is no indication in the record that Ms. Bultman's comments were about *female* employees taking leave as opposed to male employees. As such, the Court finds that none Ms. Bultman's comments to the plaintiff would allow a rational jury to infer intentional discrimination on the basis of sex.

Finally, contrary to the plaintiff's assertions, no suspicious timing exists in this case. The plaintiff argues that the time between her hire and termination—approximately two weeks or eleven business days—is "suspicious in itself." (*See* Pl's Opp. at 13, Docket #30). This argument, however, ignores that "when an employee is hired and fired by the same decision-maker in a relatively short time span, a presumption, or inference, of nondiscrimination arises. *Chiaramonte v. Fashion Bed Grp., Inc.,* 128 F.3d 391, 399 (7th Cir. 1997). Here, there is no dispute that Ms. Bultman hired the plaintiff with full knowledge of the plaintiff's gender and the fact that she had children at home. (Pl's response to DPFF ¶¶ 17-18). Although the plaintiff argues that Ms. Bultman did not expect the plaintiff to be a working mother with care responsibilities for her children, it is entirely unclear how this factor would support a finding of sex discrimination. The timing in this case, thus, supports an inference of nondiscrimination and adds nothing to the plaintiff's mosaic circumstantial evidence.

In sum, the Court finds that none of the plaintiff's "bits and pieces" evidence would allow a rational juror to infer intentional discrimination on

the basis of sex. The Court now turns to the second type of proposed evidence.

### 3.2.3   Similarly Situated Employees

As to the second prong, the plaintiff argues that a reasonable jury could conclude that Ms. Bultman treated similarly situated employees, namely, James Winkowski, Lottie Stenjem, and Katie Anglehart better than the plaintiff.

The similarly situated circumstantial evidence factor requires the plaintiff to show that "employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. *Troupe,* 20 F.3d at 736. The similarly-situated analysis calls for a "flexible, common-sense" examination of all relevant factors. *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008) (internal citation omitted). This prong's purpose is to eliminate other possible explanatory variables, "such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable"—discriminatory animus. *Humphries* v. *CBOCS W., Inc.*, 474 F.3d 387, 405 (7th Cir. 2007).

Similarly situated employees "must be 'directly comparable' to the plaintiff 'in all material respects,'" but they need not be identical in every conceivable way. *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009) (quoting *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610–11 (7th Cir.

Case 2:13-cv-01368-JPS   Filed 08/31/15   Page 21 of 26   Document 43

2006)). We are looking for comparators, not "clone[s]." *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010). So long as the distinctions between the plaintiff and the proposed comparators are not "so significant that they render the comparison effectively useless," the similarly-situated requirement is satisfied. *Humphries*, 474 F.3d at 405; *see also Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006) (the question is whether "members of the comparison group are sufficiently comparable to [the plaintiff] to suggest that [the plaintiff] was singled out for worse treatment").

Here, the plaintiff's attempt to compare herself to two other women—Lottie Stenjem and Katie Anglehart—fails at the outset. *See Troupe*, 20 F.3d at 736 (noting that a plaintiff must compare herself to "employees similarly situated to the plaintiff *other* than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment") (emphasis added). The plaintiff's comparison of herself to other women is thus irrelevant to the question of whether she was discriminated against because of her sex. Indeed,

> When female plaintiffs alleging gender-plus discrimination point to a comparator to prove their prima facie case, they must show that the comparator is both male and has the relevant plus characteristic…the other circuits to consider this issue have generally concluded that 'gender-plus plaintiffs can never be successful if there is no corresponding subclass of members of the opposite gender.'

*King v. Ferguson Enterprises, Inc.,* 971 F. Supp. 2d 1200, 1214 (N.D. Ga. 2013) *aff'd,* 568 F. App'x 686 (11th Cir. 2014) (quoting *Coleman v. B–G Maint. Mgmt. of Colo., Inc.,* 108 F.3d 1199, 1204 (10th Cir. 1997)); *accord Fisher v. Vassar Coll.,* 70 F.3d 1420, 1446 (2d Cir. 1995 ) ("To Establish that Vassar discriminated on the basis of sex plus marital status, plaintiff must show that married *men*

were treated differently from married *women.*") (emphasis in original); *Coleman*, 108 F.3d at 1203 ("Title VII prohibits employers from treating married women differently than married men, but it does not protect marital status alone."); *see also Willingham v. Macon Tel. Pub. Co.*, 507 F.2d 1084, 1089 (5th Cir. 1975) ("[S]imilarly situated individuals of either sex cannot be discriminated against vis à vis members of their own sex unless the same distinction is made with respect to those of the opposite sex."). Thus, the plaintiff's comparison of herself to other female employees clearly fails to show intentional discrimination on the basis of sex.

Finally, the plaintiff's last, and only male comparator, Mr. Winkowski, is not an employee similarly situated to the plaintiff. Most importantly, Mr. Winkowski is not similarly situated because he was not a probationary employee, and the plaintiff was. *See Steinhauer v. Degolier,* 359 F.3d 481, 485 (7th Cir. 2004) (finding two employees not similarly situated because one was still on probation while the other was not); *Spath v. Hayes Wheels Int'l–Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (holding that comparable employees must be similarly situated "in all respects"); *Bogren v. Minnesota*, 236 F.3d 399, 405 (8th Cir. 2000) (probationary state trooper not similarly situated to non-probationary state trooper); *McKenna v. Weinberger*, 729 F.2d 783, 789 (D.C. Cir. 1984) (female probationary employee not similarly situated to male permanent employee).

The plaintiff argues that her probationary status is unimportant to this analysis because "the record does not indicate that Bultman truly considered the significance of probationary or non-probationary status when terminating Ms. Gingras and when disciplining Winkowski and Stenjem, respectively." (Pl's Opp. at 23, Docket #30). In making this argument, the plaintiff cites *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dept.,* 510

F.3d 681, 689 (7th Cir. 2007); the facts of this case, however, are not analogous, and therefore the plaintiff's argument is unpersuasive. In *Peirick,* the court found that "[g]iven the considerable misunderstanding regarding the employee classifications," and the employer's "practice of providing progressive discipline to 'valuable' employees," it doubted that the defendant "took heed of employee classifications when doling out sanctions." *Id.*

In contrast, there was no such misunderstanding of employee classifications here. The record is clear that Mr. Winkowski was an employee of the County for twenty-eight years, whereas the plaintiff was a brand new employee and subject to a probationary period. (DPFF ¶ 51). The defendant's probation policy provides that supervisors may terminate probationary employees without providing formal discipline, and probationary employees are exempt from the typical progressive process. (DPFF ¶ 26). The fact that all employees are subject to civil service and work rules (PPFF ¶ 86) is thus irrelevant because of the probationary versus non-probationary distinction. As such, the plaintiff has offered no similarly situated employees to which she can compare herself; the second prong fails to provide any evidence of intentional discrimination.[6]

---

[6]The Court notes that even assuming it were to find Mr. Winkowski to be similarly situated to the plaintiff—which it undoubtably does not—the outcome under this prong would be unlikely to change. The disciplinary incidents themselves are so dissimilar as to make any comparison problematic. Mr. Winkowski received progressive discipline for being absent from his desk while getting ice water, whereas the plaintiff allegedly took off an entire days' work without authorization. Similarly, Mr. Winkowski's alleged middle finger incident after years of work without any problems cannot be compared to the plaintiff's alleged aggressive and negative behavior during her orientation.

### 3.2.4   Pretext

The third type of evidence the Court examines to establish an inference of intentional discrimination is "'evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic *and* that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.'" *Hossack v. Floor Covering Assocs. of Joliet, Inc.,* 494 F.3d 853, 862 (7th Cir. 2007) (quoting *Troupe,* 20 F.3d at 736) (emphasis added).[7]

Here, the undisputed facts show that the plaintiff was replaced by Ms. Stenjem, another *female* employee. (DPPF ¶ 61). Thus, the plaintiff cannot meet the first requirement—that she was replaced by a person not having the forbidden characteristic, namely being female. As such, the third category of circumstantial mosaic evidence is simply unavailable to the plaintiff.

### 4.   CONCLUSION

In sum, the plaintiff has provided no evidence that would allow a rational jury to infer intentional sex discrimination. There is no "mosaic" of circumstantial evidence—much less convincing evidence—to infer disparate treatment under the direct method approach. The Court reiterates that the question it is called to answer today involves whether the plaintiff has shown

---

[7] The Court notes that the parties cite to different legal standards in approaching the pretext analysis. The plaintiff cites to cases analyzing pretext under the *McDonnell Douglas* indirect evidence approach—which is not at issue here. (*See* Pl's Opp. at 29). In contrast, the defendant, correctly, cites to Seventh Circuit cases analyzing pretext under the direct "mosaic" circumstantial evidence approach, which specifically includes language that a plaintiff must show he or she was passed over or replaced by a person not having the forbidden characteristic. The plaintiff makes no argument as why a different standard should apply in this case.

page 25 of 26

evidence of sex discrimination, and nothing more. As such, the Court will grant the defendant's Motion for Summary Judgment.

Accordingly,

IT IS ORDERED that the defendant's Motion for Summary Judgment (Docket #23) be and the same is hereby GRANTED, as more fully described in detail above, and that this action be and the same is hereby DISMISSED on the merits; and

IT IS FURTHER ORDERED that the plaintiff's Motion to Set Aside or For Leave to Withdraw Admissions (Docket #35) be and the same is hereby GRANTED.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of August, 2015.

BY THE COURT:

J.P. Stoltmueller
U.S. District Judge